**Opinion filed July 10, 2026**



**In The**

# Eleventh Court of Appeals

_____

## No. 11-21-00103-CV

_____

### OVINTIV USA, INC. F/K/A PETROLEGACY ENERGY II, LLC[1] AND XTO HOLDINGS, LLC, Appellants

### V.

### HIGH NOON RESOURCES, LLC, et al., Appellees[2]

**On Appeal from the 118th District Court**
**Martin County, Texas**
**Trial Court Cause No. 7302**

**O P I N I O N**

---

[1]Post-submission, PetroLegacy Energy II, LLC merged with Ovintiv USA, Inc. and Ovintiv USA, Inc. became the surviving entity. We have substituted Ovintiv USA, Inc. as the successor to PetroLegacy's claims pursuant to PetroLegacy's motion. All references in this opinion to "PetroLegacy" refer to the claims that PetroLegacy assigned to Ovintiv USA. All references in this opinion to "Appellants" are to Ovintiv USA, Inc. f/k/a PetroLegacy Energy II, LLC and XTO.

[2]There are numerous Appellees in this appeal. Those filing briefs in this appeal included: 1) Element Petroleum Properties, LLC; 2) Jase Minerals, LP and Jase Family, Ltd. (Jase); and 3) Earle H. Chandler, Jr., Frederick H. Chandler, Tommy Sue Chandler Black, Mary Grace Chandler McFarland, John Franklin Childress, Frances Childress Ross, 5Ross LP, Wayne Bissett, and James H. Chandler (the Chandler Appellees). Post-submission, Element assigned its claims to High Noon Resources, LLC. We have substituted High Noon Resources, LLC as the successor to Element's claims pursuant to Element's motion. All references in this opinion to "Element" refer to the claims that Element assigned to High Noon Resources. The Chandler Appellees have joined in, and adopted by reference, Element's Appellee's brief in its entirety.

This is an appeal from a summary judgment. It concerns mineral conveyances that occurred in 1958 and 1962. It began as a suit to interpret three mineral deeds executed on the same date in 1962. The grantors in each of the deeds conveyed to the grantee "an undivided one-twenty-fourth (1/24th) interest in and to all of the oil, gas and other minerals in and under and that may be produced from the following described lands." At the time that the grantors executed the three 1962 mineral deeds, they each owned more than a 1/24 interest in the mineral estate; they each also owned an additional undivided 1/24 executive right interest.

This case concerns the disposition of the collective 1/8 additional executive interest of the three grantors to the 1962 mineral deeds—did they convey it to the grantee in the 1962 mineral deeds, or did they continue to possess it after the conveyance? The trial court determined that the grantors retained the additional executive interest (which it labeled "the undivided 1/8 leasehold interest") after the 1962 mineral deeds, and that Appellee Element Petroleum Properties LLC is the successor-in-interest of that 1/8 leasehold interest.

This appeal also concerns a secondary question—the nature of a royalty interest retained in a 1958 mineral deed wherein the parties used a "double fraction" to describe the reserved interest: "one-fourth (1/4th) of the usual one-eighth (1/8th) royalty (and Grantors shall be entitled to 1/4th of the 1/8th royalty irrespective of the amount of royalty actually provided for in any lease executed by Grantee, its successors or assigns)." We characterize this dispute as "secondary" in nature because Appellants contend that a construction of the 1958 mineral deed was not properly presented to the trial court for resolution. The secondary dispute focuses on the question of whether the grantors in the 1958 mineral deed retained a fixed or floating royalty interest. The trial court determined that the grantors retained a fixed royalty interest.

Appellants bring three issues that challenge the trial court's rulings. We affirm.

*Background Facts*

On August 6, 1957, E. H. Chandler and William A. Childress acquired an undivided one-half interest in the mineral estate of the C. C. Slaughter Ranch,[3] consisting of over 25,000 acres in Martin County. Chandler[4] and Childress also acquired the surface estate of the C. C. Slaughter Ranch in the 1957 deed.

On August 1, 1958, Chandler and Childress executed a mineral deed wherein they conveyed an undivided 1/4 interest in the mineral estate of the C. C. Slaughter Ranch to High Crest Realty Company. Chandler and Childress also conveyed in the same deed to High Crest the executive right to lease Chandler's and Childress's retained 1/4 interest in the mineral estate.

The 1958 mineral deed to High Crest contained the following reservation:

> PROVIDED, HOWEVER, Grantors shall be entitled to receive one-fourth (1/4th) of the cash bonus for any such lease, one-fourth (1/4th) of the delay rentals, and one-fourth (1/4th) of the usual one-eighth (1/8th) royalty (and Grantors shall be entitled to 1/4th of the 1/8th royalty irrespective of the amount of royalty actually provided for in any lease executed by Grantee, its successors or assigns), one-fourth (1/4th) of any shut-in gas royalty or penalty royalty, or other payment paid in lieu of actual production and marketing.

As noted previously, this reservation presents a secondary issue in this case—did Chandler and Childress reserve a fixed 1/32 royalty, or did they reserve a floating royalty of one-fourth of whatever royalty was specified in a future lease? Element and the other Appellees assert that Chandler and Childress reserved a fixed 1/32 royalty in the 1958 mineral deed and that they conveyed an "excess royalty" to High

---

[3]All references to "the C. C. Slaughter Ranch" are to the tract of over 25,000 acres described in the 1957 deed.

[4]All references to "Chandler" are to E. H. Chandler.

Crest.  Element described the "excess royalty" in its original petition as "the right to royalties over and above the usual 1/8 that might be provided for in any oil and gas lease covering the 1/4 interest in the Minerals retained by Chandler and Childress."

After executing the 1958 mineral deed to High Crest, Chandler and Childress conveyed to third parties all interests retained by them in the 1958 mineral deed. Those interests are not relevant to this suit.  Instead, the interests that are in controversy arise from those that Chandler and Childress conveyed to High Crest in the 1958 mineral deed.  As set forth below, Chandler and Childress later reacquired a portion of the interests that they conveyed to High Crest in the 1958 mineral deed.

On December 29, 1961, High Crest executed a mineral deed wherein it conveyed one-half of all rights it acquired in the 1958 mineral deed to Coronet Investment Company, one-quarter to Chandler, and one-quarter to Childress.  By virtue of this 1961 mineral deed, Chandler and Childress collectively reacquired a 1/8 interest in the mineral estate and a 1/4 interest in the executive rights to the minerals.

On March 10, 1962, Chandler and Childress conveyed by mineral deed to Wayne Chandler, Jr. and William E. Chandler one-third of their interests (collectively, an undivided 1/24 interest in the mineral estate and a 1/12 interest in the executive rights).  On April 7, 1962, Wayne and William conveyed all their interests (collectively, an undivided 1/24 interest in the mineral estate and a 1/12 interest in the executive rights) to Excuderunt, Inc.  After these conveyances, Chandler, Childress, and Excuderunt each owned a 1/12 interest in the executive rights and an undivided 1/24 interest in the mineral estate.

On October 31, 1962, Chandler, Childress, and Excuderunt each executed mineral deeds in favor of General Crude Oil Company wherein each of them

4

conveyed "an undivided one-twenty-fourth (1/24th) interest in and to all of the oil, gas and other minerals in and under and that may be produced from the following described lands situated in Martin County." The "described lands" consisted of tracts of approximately 7,000 acres, which included a portion of the C. C. Slaughter Ranch.[5]

The initial question to be resolved in this appeal focuses on these three mineral deeds executed on October 31, 1962. As previously noted, in addition to the 1/24 mineral interest that Chandler, Childress, and Excuderunt each owned, they also each owned a 1/12 undivided interest in the executive rights. Simply put, we must determine whether Chandler, Childress, and Excuderunt conveyed their additional, collective 1/8 executive interest along with the collective 1/8 mineral interest that they conveyed to General Crude. We will refer to this additional 1/8 executive interest as "the disputed 1/8 leasehold interest." We note in this regard that the trial court described the disputed 1/8 executive interest as the "undivided 1/8 leasehold interest" in the operative interlocutory order granting Element's motion for partial summary judgment. As set forth below, the first issue in this appeal concerns who owned the disputed 1/8 executive right as a result of the 1962 mineral deeds and thereby had the right to lease it for production.

With respect to the disputed 1/8 leasehold interest, Element had leases from successors-in-interest of Chandler, Childress, and Excuderunt (the grantors in the 1962 mineral deeds). PetroLegacy had leases from successors-in-interest to General Crude (the grantee of the 1962 mineral deeds). Element filed the underlying suit solely against PetroLegacy asserting several causes of action based on PetroLegacy's claim that Chandler, Childress, and Excuderunt conveyed the

---

[5]The property descriptions in the 1962 mineral deeds from Chandler and Excuderunt are identical; they describe conveyed tracts of 7,009.6 acres. The property description in Childress's 1962 mineral deed is slightly different, and the tract that it conveyed was larger—7,280 acres.

disputed 1/8 leasehold interest to General Crude when they conveyed their collective 1/8 interest in the mineral estate in the 1962 mineral deeds. PretroLegacy filed a counterclaim against Element asserting a claim for trespass to try title.

Early in the litigation, Element filed a motion for partial summary judgment seeking a determination that it held superior title to the disputed 1/8 leasehold interest. PetroLegacy subsequently filed a motion to abate and to compel joinder seeking an order requiring Element to join all successors-in-interest to Chandler and Childress under the 1958 deed with respect to Element's excess royalty claim. In response, Element asserted that it only sought a declaration concerning its own rights under the 1962 mineral deeds.

The trial court granted PetroLegacy's initial motion to abate and compel joinder. Element filed an amended petition wherein it joined numerous "Rule 39 Defendants," including Appellant XTO, the majority of the Chandler Appellees, and Jase. XTO entered its appearance in the underlying proceedings by filing a general denial and a plea of "not guilty" to Element's claim for trespass to try title. Jase entered its appearance by filing a general denial.

Element later filed a motion asking the trial court to lift the abatement on the basis that Element had added all the parties that the trial court specified in its joinder order. In response, PetroLegacy asserted that Element had not complied with the trial court's order because it had not joined all necessary parties. PetroLegacy also filed an amended motion to dismiss the suit based on its contention that Element had not joined all necessary parties. The trial court ultimately entered an order lifting its earlier abatement. The trial court also entered an order specifying that Element was only required to join 1) XTO; 2) the lessors of the leases identified in Element's pleading; 3) and "any and all persons claiming any part of the undivided 1/4 non-executive mineral estate reserved in the High Crest Deed whose interests fall within the disputed acreage subject to Element's Leases."

6

Jase filed a motion for partial summary judgment wherein it sought a declaration that the grantors in the 1958 High Crest deed only reserved a fixed 1/32 royalty interest. In response, PetroLegacy filed another motion to abate and request for an order compelling Jase to join necessary parties. PetroLegacy asserted that the relief requested by Jase in its motion for partial summary judgment concerned mineral interest owners in over 25,000 acres and that all of them needed to be joined because their interests might be affected. Jase filed a second motion for partial summary judgment wherein it attempted to limit the scope of its requested relief with respect to PetroLegacy's joinder contention.

XTO filed a motion for summary judgment wherein it asserted that, in the 1962 mineral deeds, the grantors conveyed to General Crude the disputed 1/8 leasehold interest, and that it thereby owned the interest. XTO additionally noted in its motion for summary judgment that it "adopts and incorporates by reference" PetroLegacy's motion for summary judgment. In this regard, XTO was PetroLegacy's lessor. PetroLegacy filed its motion for summary judgment on the same day that XTO filed its motion for summary judgment.

The trial court held a hearing on the pending matters on December 2, 2019. The first matter considered by the trial court at the hearing was PetroLegacy's subsequent motion to abate the case pending its request for Jase to join additional parties based upon the relief requested in Jase's motion for summary judgment. The trial court then considered the pending motions for summary judgment, including PetroLegacy's contention that there was no basis for granting Jase's motion for summary judgment because Jase had not pleaded a claim for affirmative relief. The trial court ultimately denied PetroLegacy's subsequent motion to abate for the joinder of additional parties with respect to Jase's motion for partial summary judgment. It also granted Element's motion for partial summary judgment, denied

PetroLegacy's and XTO's motions for summary judgment, and granted Jase's motion for partial summary judgment.

Afterwards, the trial court entered a final judgment that incorporated the three previously referenced interlocutory orders. Based upon the parties' stipulation of damages, the trial court entered judgment in favor of Element against PetroLegacy for $471,837. The trial court also ordered PetroLegacy to pay attorney's fees of $350,000 to Element, and to pay Element's future attorney's fees in the event of an appeal.

*Analysis*

*Issues on Appeal*

Appellants jointly filed a brief in this appeal. Their first issue concerns the interpretation of the 1962 mineral deeds with respect to the disposition of the disputed 1/8 leasehold interest. They contend that the trial court erred by granting Element's motion for summary judgment and denying their motions for summary judgment on this issue. In their second issue, Appellants assert that the trial court erred by denying PetroLegacy's motion to abate and compel the joinder of all interest holders that claimed under the 1958 High Crest deed. In their third issue, Appellants assert that the trial court erred in declaring that the 1958 High Crest deed reserved a fixed royalty. They assert two sub-issues in support of their third issue: 1) that no party asserted an affirmative claim for relief seeking a construction of the 1958 High Crest deed; and 2) the plain language of the deed reserved a floating royalty.

*Ownership of the Disputed 1/8 Leasehold Interest*

Appellants' first issue focuses on the correct interpretation of the 1962 mineral deeds and the trial court's orders granting summary judgment in favor of Element and denying summary judgment for PetroLegacy and XTO on the matter. We review the trial court's grant of summary judgment de novo. *Lujan v. Navistar,*

*Inc.*, 555 S.W.3d 79, 84 (Tex. 2018) (citing *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003)). Summary judgment is proper when no genuine issues of material fact exist, and the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c).[6] When the parties file competing summary judgment motions and the trial court grants one and denies the other, "we consider the summary judgment evidence presented by both sides, determine all questions presented, and if the trial court erred, render the judgment the trial court should have rendered." *Sw. Bell Tel., L.P. v. Emmett*, 459 S.W.3d 578, 583 (Tex. 2015).

We review a trial court's construction of a deed de novo. *See Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 743 (Tex. 2020). An appellate court may only construe a deed as a matter of law if it is unambiguous. *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 874 (Tex. 2018) (citing *J. Hiram Moore, Ltd. v. Greer*, 172 S.W.3d 609, 613 (Tex. 2005)). If a deed is worded in such a way that it can be given a certain or definite legal meaning, then the deed is not ambiguous. *Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 601 (Tex. 2018). Here, the parties do not contend that the 1962 deed is ambiguous, nor do we determine it to be ambiguous.

Our task when construing an unambiguous deed is to "ascertain the intent of the parties from the language in the deed" as expressed within the "four corners" of the instrument. *Luckel v. White*, 819 S.W.2d 459, 461 (Tex. 1991). The four-corners rule requires the court to ascertain the intent of the parties solely from all of the language in the deed. *Wenske v. Ealy*, 521 S.W.3d 791, 794 (Tex. 2017) (citing *Luckel*, 819 S.W.2d at 461). The intent that governs is not the intent that the parties

---

[6]We note that the Texas Supreme Court has recently revised Rule 166a. Although the "rewrite is not intended to substantively change the law," it has resulted in a renumbering of the provisions of the rule. *See* Final Approval of Amendments to Rule 166a of the Texas Rules of Civil Procedure, Misc. Docket No. 26-9012 (Tex. Feb. 27, 2026). The amendments to this rule only apply to motions for summary judgment filed on or after March 1, 2026. Because the motions for summary judgment in this case were filed prior to that date, we refer to the rule in effect at the time the motions were filed. *See id.*

meant but failed to express, but rather the intent that is expressed. *Luckel*, 819 S.W.2d at 462.

As stated in *Altman v. Blake*:

> There are five essential attributes of a severed mineral estate: (1) the right to develop (the right of ingress and egress), (2) the right to lease (the executive right), (3) the right to receive bonus payments, (4) the right to receive delay rentals, (5) the right to receive royalty payments.

712 S.W.2d 117, 118 (Tex. 1986). The first issue that we must address in this case focuses on the executive right—the right to lease. *See id.*

The nature of the interest conveyed by a deed is ascertained from the language of the deed itself. *See Endeavor Energy Res., LP v. Trudy Jane Anderson Testamentary Tr., by & Through Anderson*, 644 S.W.3d 212, 223–24 (Tex. App.—Eastland 2022, pet. denied). The grantors to the 1962 mineral deeds each conveyed "an undivided one-twenty-fourth (1/24th) interest in and to all of the oil, gas and other minerals in and under and that may be produced from the following described lands situated in Martin County." PetroLegacy and XTO assert that the grantors to the 1962 mineral deeds also conveyed their additional 1/24 executive interests that they each owned because they did not expressly reserve them in the deeds. They base their contention on the holding in two opinions from the Eighth Court of Appeals: *Anadarko Petroleum Corp. v. BNW Prop. Co.*, 393 S.W.3d 846, 849–50 (Tex. App.—El Paso 2012, pet. denied) and *Chesapeake Expl., L.L.C. v. BNW Prop. Co.*, 393 S.W.3d 852, 855 (Tex. App.—El Paso 2012, pet. denied). These two opinions are nearly identical, and they address the same conveyance. Because of the similarity of the opinions, we will restrict our discussion to *Anadarko*.

In *Anadarko*, the grantor owned a 1/3 mineral interest and 4/9 executive right. 393 S.W.3d at 848. According to the opinion, the grantor conveyed the 1/3 mineral

interest in deeds that were silent as to the 4/9 executive right.[7]  *Id.*  The Eighth Court of Appeals concluded that "when a mineral interest is conveyed, the executive right incident to that interest is also conveyed unless specifically reserved.  Accordingly, unless executive rights are expressly reserved or excepted in a deed, they pass under the deed, even if their proportion is greater than the mineral interest conveyed."  *Id.* at 850 (internal citation omitted).  Element acknowledged at oral argument that the holding in *Anadarko* is contrary to the trial court's interpretation of the 1962 mineral deeds.

The court in *Anadarko* based its decision on two Texas Supreme Court opinions: *Day & Co., Inc. v. Texland Petroleum, Inc.*, 786 S.W.2d 667 (Tex. 1990) and *Lesley v. Veterans Land Bd.*, 352 S.W.3d 479 (Tex. 2011).  PetroLegacy and XTO also rely on *Day* and *Lesley* in support of their first issue.

*Day* involved a conveyance wherein the grantor, "Day, Inc." (as denoted by the court), owned all of the surface, one-half of the minerals and all of the executive rights to an eighty-acre tract.[8]  786 S.W.2d at 668.  Day, Inc. conveyed ten of the eighty acres to the Shoafs, reserving an undivided one-quarter interest in the minerals and excepting the one-half of the mineral estate that was previously reserved by Day, Inc.'s predecessors-in-interest.  *Id.*  However, the conveyance of the ten acres was silent with respect to the executive rights held by Day, Inc.  *Id.*

Day, Inc. asserted that it owned three-fourths of the executive right to the minerals of the ten-acre tract after the conveyance, including the executive right attributable to the one-half interest in the minerals reserved by Day, Inc.'s predecessors-in-interest.  *Id.*  The Texas Supreme Court disagreed, holding that

---

[7]The opinion in *Anadarko* did not set out the exact language of the deed at issue.  However, Element submitted a certified copy of the deed at issue in *Anadarko* as an exhibit to its first amended motion for summary judgment.

[8]Day, Inc.'s predecessors-in-interest, Keaton and Young, reserved one-half of the mineral estate in their conveyance to Day, Inc.  *Day*, 786 S.W.2d at 668.

11

Day, Inc. conveyed the executive right attributable to the one-half interest in the minerals held by its predecessors-in-interest "because Day, Inc. did not reserve or except such interest from the conveyance." *Id.* at 669–70. The court acknowledged the "common law property principle which states 'that a warranty deed will pass all of the estate owned by the grantor at the time of the conveyance unless there are reservations or exceptions which reduce the estate conveyed.'" *Id.* at 668 (quoting *Cockrell v. Texas Gulf Sulphur Co.*, 299 S.W.2d 672, 675 (Tex. 1956)); *see Rahlek, Ltd. v. Wells*, 587 S.W.3d 57, 64 (Tex. App.—Eastland 2019, pet. denied) (Generally, deeds are construed to confer upon the grantee the greatest estate that the terms of the instrument will allow. (citing *Lott v. Lott*, 370 S.W.2d 463, 465 (Tex. 1963))). Thus, Day, Inc. conveyed the executive right attributable to the one-half mineral interest previously reserved by its predecessors when it executed a general warranty deed to the Shoafs for the ten-acre tract without a reservation or exception of such interest from the conveyance. *Day*, 786 S.W.2d at 669–70.

*Lesley*, a case that originated from within this court's geographic territory, involved a developer, Bluegreen, that owned the entire executive right in the 4,100-acre mineral estate of a subdivision. 352 S.W.3d at 481. Bluegreen conveyed lots in the subdivision to lot owners in general warranty deeds that were silent with respect to the executive right held by Bluegreen. *Id.* at 481–82, 486. The Texas Supreme Court in *Lesley* held that the circumstances were "[v]ery similar" to those in *Day*, and that Bluegreen conveyed the executive right attributable to the entire mineral estate to the lot owners because it did not reserve the executive right in its deeds to the lot owners.[9] *Id.*

---

[9]Additionally, the Texas Supreme Court in *Lesley* addressed the nature of the duty that the owner of the executive right owes to the non-executive interest owner, which the court noted was one of the "principal" issues in the case. *Id.* at 487–92; *see Texas Outfitters Ltd., LLC v. Nicholson*, 572 S.W.3d 647, 652–53 (Tex. 2019); *KCM Fin., LLC v. Bradshaw*, 457 S.W.3d 70, 81–82 (Tex. 2015). In *Nicholson* and

12

Appellants cite *Day* and *Lesley* for the proposition that "[w]hen a mineral interest is conveyed, appurtenant executive rights are also conveyed unless expressly reserved, even if the quantum of the executive right exceeds the fraction of the mineral interest being conveyed." This statement reflects the *outcome* of *Day* and *Lesley*, but it does not accurately reflect the *basis* for that outcome.

The critical question decided in *Day* was the disposition of the executive right attributable to the one-half mineral interest reserved by Day, Inc.'s predecessors-in-interest. *Day*, 786 S.W.2d at 669; *see Lesley*, 352 S.W.3d at 486 (discussing *Day*). As we noted in *Rahlek*, a deed will pass whatever interest the grantor has in the land, unless it contains language showing a clear intention to grant a lesser estate. 587 S.W.3d at 64 (citing *Sharp v. Fowler*, 252 S.W.2d 153, 154 (Tex. 1952)). The executive right attributable to the one-half mineral interest reserved by Day, Inc.'s predecessors-in-interest passed to the Shoafs because Day, Inc. executed a deed that did not show an intent for Day, Inc. to grant a lesser estate than what Day, Inc. owned in the ten-acre tract other than the 1/4th mineral interest that Day, Inc. reserved for itself. *Day*, 786 S.W.2d at 669–70; *see Lesley*, 352 S.W.3d at 486.

Reservations and exceptions are methods by which the grantor may "exclude[] for itself a portion of that which would otherwise fall within the deed's description of the interest granted." *Piranha Partners*, 596 S.W.3d at 748. But reservations and exceptions are not the only way for a grantor to convey a lesser estate. *Id.* "A grantor may withhold for itself a part of its estate either by granting the entire estate but reserving the portion it desires to retain or by granting only the portion it desires to convey." *Id.* (emphasis omitted) (There is a "difference between a deed that conveys only a partial interest and a deed that conveys an entire

*Bradshaw*, the Texas Supreme Court expounded upon its holding in *Lesley* with respect to the duty owed by the owner of the executive right. *Nicholson*, 572 S.W.3d at 652–53; *Bradshaw*, 457 S.W.3d at 81–82.

interest but reserves a part of that interest." (quoting *Wenske*, 521 S.W.3d at 806 (Boyd, J., dissenting))).  Applying this principle from *Piranha Partners* to the 1962 mineral deeds at issue here, the grantors expressed their intent to convey a lesser estate because they only granted a portion of what they owned: "an undivided one-twenty-fourth (1/24th) interest in and to all of the oil, gas and other minerals in and under and that may be produced from the following described lands situated in Martin County."

Appellants assert in their reply brief that *Piranha Partners* is inapplicable to the 1962 mineral deeds because it requires the court to give priority to the granting clause over other clauses in the deeds.  Specifically, Appellants point to the following clause in the 1962 mineral deeds:

> TO HAVE AND TO HOLD The above described property and easement[10] with all and singular the rights, privileges and appurtenances thereunder or any wise belonging to the said Grantee herein its successors, and assigns forever, and Grantor does hereby bind [itself/himself], [its/his] heirs, executors, administrators, successors and assigns to warrant and forever defend all and.

Appellants contend that the additional 1/24 executive interest owned by each of the grantors to the 1962 mineral deeds was an appurtenant right to their respective 1/24 mineral interest, and as such, was conveyed in the 1962 deeds by virtue of the above-quoted provision.

Appellants' reliance on the "to have and to hold" clause is misplaced.  This provision is typically referred to as a general warranty clause.  *See* Aloysius A. Leopold, 5 *Texas Practice Series: Land Titles And Title Examination* § 34.17 (3d ed. 2025) (Form—general warranty clause for Texas deed); *see also Gardner Energy Corp. v. McNeil, McNeil, & Holt*, No. 08-23-00140-CV, 2023 WL 8937162,

---

[10]The 1962 mineral deeds also conveyed to the grantee "the rights of ingress and egress at all times for the purpose of mining, drilling, exploring, operating and developing said lands for oil, gas and other minerals, and storing, handling, transporting and marketing the same therefrom."

14

at *6 (Tex. App.—El Paso Dec. 27, 2023, pet. denied) (mem. op.) (referring to the clause as a "warranty clause"); *Barrow Shaver Res. Co. LLC v. NETX Acquisitions, LLC,* No. 06-20-00081-CV, 2021 WL 3571394, at *5 (Tex. App.—Texarkana Aug. 13, 2021, pet. denied) (mem. op.) (referring to the clause as a "warranty/habendum clause"). As we noted in *Stewman Ranch, Inc. v. Double M Ranch, Ltd.*:

> The warranty serves to indemnify the purchaser against a loss or injury he may sustain by a defect in the seller's title. *The warranty clause does not convey title nor does it determine the character of the title conveyed.* Rather, it warrants that the same estate or any right, title, or interest therein has not been conveyed to any person other than the grantee and that the property is free from encumbrances.

192 S.W.3d 808, 811 (Tex. App.—Eastland 2006, pet. denied) (internal citations omitted) (emphasis added); *see Farm & Ranch Invs., Ltd. v. Titan Operating, L.L.C.,* 369 S.W.3d 679, 684 (Tex. App.—Fort Worth 2012, pet. denied) (citing *Stewman Ranch,* 192 S.W.3d at 811). Accordingly, the warranty clause in the 1962 mineral deeds upon which Appellants rely did not convey title, nor did it determine the character of the title conveyed by the 1962 mineral deeds. *See Stewman Ranch,* 192 S.W.3d at 811 (citing *Davis v. Andrews,* 361 S.W.2d 419, 424–25 (Tex. App.—Dallas 1962, writ ref'd n.r.e.)).

Under the holding in *Piranha Partners*, the grantors in the 1962 mineral deeds expressed their intent to convey a lesser estate because they only granted a portion of what they owned. *See Piranha Partners,* 596 S.W.3d at 748. By doing so, it was unnecessary for the grantors to reserve or except the executive right interest they owned in excess of the executive right attributable to the 1/24 mineral interest they each owned in order for them to retain this additional executive right interest. *See id.* To the extent that *Anadarko* can be read to require a reservation or exception of an additional executive right for it to be retained by the grantor in a

conveyance where the grantor only conveys a partial interest, we disagree with its holding.

We conclude that the trial court correctly interpreted the 1962 mineral deeds based upon the language of the deeds themselves. The grantors in the 1962 mineral deeds did not convey the disputed 1/8 leasehold interest[11] that they also owned because they only conveyed their collective 1/8 ownership interest in the minerals.

Appellants additionally assert a policy reason for why the 1962 mineral deeds should be construed as conveying the disputed 1/8 leasehold interest. They contend that the trial court's construction of the 1962 mineral deeds would permit an improper "naked" executive right. Appellants base this contention on the quantum of royalty interest they assert was reserved by the grantors in the 1958 High Crest deed—a question that we later address in this opinion.

We note at the outset that in *Nicholson*, the Texas Supreme Court made a passing reference to a naked executive right wherein it stated: "To the extent uncertainty exists as to whether ownership of an executive right absent any associated mineral or royalty interest is permissible, we need not address it here because Texas Outfitters owned both the executive right and an associated mineral interest." 572 S.W.3d at 656 n.13 (citing Monika U. Ehrman, *One Oil and Gas Right to Rule Them All*, 55 HOUS. L. REV. 1063, 1066 (2018) for the proposition that few cases involve an executive interest without an associated mineral or royalty interest). This statement in *Nicholson* suggests that the Texas Supreme Court has not definitively ruled on the purported impermissibility of a naked executive interest. *See id.*

---

[11]To clarify, the "disputed 1/8 leasehold interest" refers to the additional, collective 1/8 executive right interest owned by the grantors of the 1962 mineral deeds that they owned in addition to the collective 1/8 interest in the minerals that they owned.

Appellants first cite *Day* for the proposition that an executive right interest cannot be "naked" and that it must be appurtenant to some other attribute of the mineral estate. In *Day*, the Texas Supreme Court addressed the nature of the executive right. 786 S.W.2d at 668–69. In doing so, it noted its prior precedent in *Pan Am. Petroleum Corp. v. Cain*, 355 S.W.2d 506 (Tex. 1962), wherein it had determined that the executive right is a not an interest in land, but rather was a power of appointment with "its scope and extent . . . governed by the instrument creating it." *Id.* at 669 (quoting *Cain*, 355 S.W.2d at 510). The court in *Day* overruled *Cain* by holding that the executive right "is an interest in property, an incident and part of the mineral estate like the other attributes such as bonus, royalty and delay rentals." *Id.*

Appellants rely on a statement in *Day* that quotes the dissenting opinion in *Cain*: "the executive right reserved by the grantor 'was a property right, an interest in land, appurtenant to the mineral interest therein conveyed, and for the use and benefit of the mineral interest retained and owned by [the grantor].'" *Day*, 786 S.W.2d at 669 (quoting *Cain*, 355 S.W.2d at 511 (Smith, J., dissenting)). Appellants' reading of *Day* is incorrect. Immediately before citing the statement from the dissenting opinion in *Cain*, the court in *Day* stated: "Even when [the executive right] is severed from the other rights or attributes incident to the mineral estate, it remains an interest in property." *Id.* This statement in *Day* recognizes that the executive right can be severed from the other rights that make up the mineral estate. *Id.* As such, the executive right is severable from the other rights that make up the mineral estate, and it remains an independent interest in property after severance. *See id.*

Appellants also cite the Fourteenth Court of Appeals's opinion in *Luckel v. White* for the proposition that "the executive right, unlike other attributes of the mineral estate, must remain 'appurtenant to' some other mineral interest." *See*

*Luckel v. White*, 792 S.W.2d 485, 489 n.3 (Tex. App.—Houston [14th Dist.] 1990), *rev'd on other grounds*, 819 S.W.2d 459 (Tex. 1991). The court of appeals in *Luckel* cited *Day* for this proposition. *Id.* For the reasons expressed in the preceding paragraph, we respectfully disagree with this reading of *Day*.

Legal commentators have opined that under *Day*, the executive right can be held exclusively from the rest of the mineral estate and can therefore be a naked right. Christopher Kulander, *Big Money vs. Grand Designs: Revisiting the Executive Right to Lease Oil & Gas Interests*, 42 TEX. TECH L. REV. 33, 39–42 (2009) (collecting secondary authorities). As summarized by Professor Kulander:

> In the end, (a) case law in Texas gives no indication that the executive right is not completely alienable as a separate stick within the bundle of interests that comprise the mineral estate; (b) *Day* appears to all but settle the question that the executive rights, shorn of all other mineral interests, can be held exclusively; and (c) legal commentators seem to agree that the executive right can be held exclusive of all other mineral rights within the mineral estate.

*Id.* at 42. Moreover, the Texas Supreme Court's statement in *Nicholson* regarding the "uncertainty" of the permissibility of a naked executive right indicates that the court did not prohibit a naked executive right in *Day*. *Nicholson*, 572 S.W.3d at 656 n.13. Thus, *Day* does not preclude a naked executive right. *See Day*, 786 S.W.2d at 669. To the contrary, its language suggests that a naked executive right interest is permissible. *See id.* Accordingly, the trial court's construction of the 1962 mineral deeds, which we conclude was correct, did not create an impermissible naked executive right because an executive right may be "naked" under Texas law.[12]

We overrule Appellants' first issue.

---

[12]Based on our construction of the 1958 High Crest deed as set out below, the disputed 1/8th leasehold interest that was retained by the grantors to the 1962 mineral deeds did not constitute a naked executive right.

*Joinder*

In their second issue, Appellants assert that the trial court erred by denying PetroLegacy's motion to abate and compel the joinder of all interest holders that claimed under the 1958 High Crest mineral deed. Their second issue is directed at their subsequent joinder request, which they sought in response to Jase's motion for partial summary judgment. In PetroLegacy's motion to abate, it sought to compel Jase to join "all persons that succeeded to any part of the interests of the Grantors or the Grantee in approximately 25,286.58 acres under the 1958 High Crest Deed." Specifically, it alleged that "these parties have or claim an interest that would be affected by the declaration sought" by Jase in Jase's second motion for partial summary judgment. Appellants assert that the trial court erred by only requiring the joinder of parties who owned interests in the same acreage that was the subject of Element's claim to the disputed 1/8 leasehold estate, which was smaller in size to the lands affected by the 1958 mineral deed.[13] In many respects, the joinder issue poses the question of who should expend the effort and incur the expense of joining the additional interest owners that PetroLegacy sought to be joined to this lawsuit—Jase or PetroLegacy?

We review a trial court's rulings on issues concerning joinder of parties for an abuse of discretion. *Crawford v. XTO Energy, Inc.*, 509 S.W.3d 906, 910–11 (Tex. 2017) (citing *Royal Petroleum Corp. v. Dennis*, 332 S.W.2d 313, 317 (Tex. 1960)). "A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." *Id.* (quoting *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002)). "When a party seeks to compel joinder of persons as parties to a proceeding, including a declaratory-judgment action, Texas Rule of Civil Procedure 39 governs." *In re Kappmeyer*,

---

[13]Appellants assert that the joinder ordered by the trial court required the joinder of interest owners in approximately 3,700 acres that were the subject of Element's petition.

19

668 S.W.3d 651, 655 (Tex. 2023) (orig. proceeding); *Crawford*, 509 S.W.3d at 911 & n.3 ("Texas Rule of Civil Procedure 39 provides the framework for determining when joinder of a party is mandatory."). Rule 39 describes the following persons who "shall be joined":

> **(a) Persons to Be Joined if Feasible**. A person who is subject to service of process shall be joined as a party in the action if
>
>> (1) in his absence complete relief cannot be accorded among those already parties, or
>>
>> (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may
>>
>>> (i) as a practical matter impair or impede his ability to protect that interest or
>>>
>>> (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party.

Tex. R. Civ. P. 39(a).

Appellants primarily rely on Rule 39(a)(2)(ii). As noted in *Kappmeyer*,

> Applying this rule requires a two-step inquiry. First, does the person whose joinder is sought 'claim[] an interest relating to the subject of the action'? Second, will disposition of the action in the person's absence leave any of the current parties 'subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest'?"

668 S.W.3d at 656 (quoting Tex. R. Civ. P. 39(a)(2)(ii)). "If the answer to either of those questions is no, then Rule 39 does not mandate joinder of that person and, in turn, does not authorize the trial court to order that he be made a party." *Id.* (citing *Crawford*, 509 S.W.3d at 912).

In *Crawford*, the Texas Supreme Court addressed the meaning of "claim" in Rule 39(a)(2). *Crawford*, 509 S.W.3d at 912. After citing various dictionary

definitions of "claim," the court noted that one claims an interest when he demands or asserts an ownership interest. *Id.* The court held: "In sum, Rule 39 does not require joinder of persons who potentially could claim an interest in the subject of the action; it requires joinder, in certain circumstances, of persons who actually claim such an interest." *Id.* at 913. As noted in *Kappmeyer*, the court in *Crawford* highlighted the distinction "between persons 'having' an interest that could be claimed and actually 'claiming' that interest" for purposes of compulsory joinder under Rule 39(a)(2). 668 S.W.3d at 657. Further, the court in *Crawford* noted that a party seeking to join parties to an action may utilize Rule 37 to join the parties when the opposing party is not mandated by Rule 39 to join them. *Crawford*, 509 S.W.3d at 914.

*Crawford* involved a suit against an oil and gas lessee for failure to pay royalties. *Id.* at 908. The lessee sought an order requiring the plaintiff to join neighboring landowners to the suit as necessary parties. *Id.* In that regard, the dispute concerned an application of the strip-and-gore doctrine. *Id.* at 909. The lessee had been paying royalties to the adjacent landowners pursuant to a title opinion. *Id.* at 908–09. The lessee made the unilateral decision to pay royalties to the adjacent landowners. *Id.* at 913. The trial court and the intermediate court of appeals determined that joinder of the neighboring owners was required. *Id.* at 909. In reversing the lower courts, the supreme court determined that joinder was not required because "no record evidence shows or even suggests" that the adjacent landowners ever demanded or asserted ownership of a royalty interest in the subject minerals. *Id.* at 912.

The court in *Crawford* cited cases involving oil and gas leases and title disputes in which the joinder of nonparty lessors was required. *Id.* at 912–13. One of those cases is *Longoria v. Exxon Mobil Corp.*, 255 S.W.3d 174, 182 (Tex. App.— San Antonio 2008, pet. denied). PetroLegacy and XTO assert that the facts before

21

us are analogous to the circumstances in *Longoria*. The court in *Crawford* included this parenthetical with its citation to *Longoria*: "(holding that, where the plaintiffs sued energy companies seeking to establish title to an undivided one-half interest in a partially leased mineral estate, the trial court did not abuse its discretion in ordering joinder of 'the record owners of 100% of the royalty interests and the possibility of reverter of the mineral estate')." *Id.* at 913 (quoting *Longoria*, 255 S.W.3d at 182). The court noted that in cases of this type, "the absent parties expressly claimed an interest in the subject of the litigation through their deeds and leases." *Id.*

The plaintiffs in *Longoria* were descendants of Jose M. Longoria. 255 S.W.3d at 177. They asserted that he acquired by adverse possession a one-half interest in a 9200-acre tract prior to the mineral estate being severed from the surface. *Id.* They filed suit seeking to establish title to an undivided one-half of the mineral estate. *Id.* In doing so, the plaintiffs sought to declare void a 1924 partition judgment. *Id.* at 179. Some of the defendants sought to compel the plaintiffs to join all persons having record title to and royalty interests in the tract. *Id.* at 177–78. The trial court dismissed the plaintiffs' suit for failing to join "absent mineral interest owners." *Id.*

Because joinder issues are subject to review for abuse of discretion, there is a critical distinction to make with respect to *Longoria*—the trial court required joinder in that case. The Fourth Court of Appeals noted the broad discretion that the trial court possesses in determining joinder questions, and it ultimately determined that the trial court did not abuse its discretion by requiring joinder. *Id.* at 179, 181–83. But here, the trial court denied PetroLegacy's subsequent joinder request. We conclude that the trial court did not abuse its discretion by denying PetroLegacy's motion to abate and compel joinder.

22

The Fourth Court of Appeals in *Longoria* noted that the absent lessors "clearly claim[ed]" an interest in the subject of the action. *Id.* at 182. But here, PetroLegacy sought the joinder of parties that "have or claim an interest" as stated in its joinder motions. Merely "having" an interest is insufficient to compel joinder under Rule 39(a)(2). *Kappmeyer*, 668 S.W.3d at 657 (discussing *Crawford*). Additionally, PetroLegacy sought an order from the trial court requiring Jase to "identify and join *all* successors to the interests of the Grantors and the Grantee of the High Crest Deed." Because PetroLegacy sought to require Jase to *identify* the persons and entities that it sought to be joined, there is no evidence in the record that "shows or even suggests" that the additional parties that PetroLegacy sought to be joined have demanded or asserted ownership to an interest that might be affected by the declaration sought by Jase with respect to the 1958 High Crest deed. *See Crawford*, 509 S.W.3d at 912.

We overrule Appellants' second issue.

*Interpretation of the 1958 High Crest Deed*

In their third issue, Appellants challenge the trial court's interpretation of the 1958 High Crest deed. By doing so, they challenge the trial court's grant of Jase's motion for partial summary judgment. There are two parts to Appellants' third issue. They first assert that no party pleaded an affirmative claim seeking a construction of the 1958 deed, including Jase. They also contend that the trial court erred by concluding that the grantors in the 1958 deed only reserved a fixed 1/32 royalty.

*Adequacy of the Pleadings*

In its motion for partial summary judgment, Jase sought a declaratory judgment with respect to the interpretation of the 1958 High Crest deed. Specifically, Jase sought a declaration that the grantors to the deed only reserved a fixed 1/32 royalty interest in future oil and gas leases. PetroLegacy objected to

23

Jase's motion for summary judgment on the ground that it was not supported by the pleadings on file. PetroLegacy asserted that no party had asserted a claim for declaratory relief related to the construction of the 1958 High Crest mineral deed. In that regard, Jase had not pleaded any claims for affirmative relief, but rather had only asserted a general denial in response to Element's petition adding Jase as a Rule 39 defendant.

Summary judgment cannot be granted on an unpleaded claim when the nonmovant objects. *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 494–95 (Tex. 1991); *see* TEX. R. CIV. P. 301 (A "judgment of the court shall conform to the pleadings."); *Cunningham v. Parkdale Bank*, 660 S.W.2d 810, 812–13 (Tex. 1983) ("[T]he judgment of the court must conform to the pleadings of the parties.").

We first address Appellants' contention that no party pleaded a claim for declaratory relief with respect to the 1958 mineral deed. The Uniform Declaratory Judgments Act allows a person interested under a written contract to present a question to the trial court concerning the validity or construction of the contract in order to "obtain a declaration of rights, status, or other legal relations thereunder." TEX. CIV. PRAC. & REM. CODE ANN. § 37.004(a) (West 2020); *Devon Energy Prod. Co., L.P. v. KCS Res., LLC*, 450 S.W.3d 203, 210 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "[A] declaratory judgment action is not necessarily an action for affirmative relief." *Republic Ins. Co. v. Davis*, 856 S.W.2d 158, 164 (Tex. 1993). "[T]he Act does not create or enlarge a trial court's subject matter jurisdiction; it is 'merely a procedural device for deciding cases already within a court's jurisdiction.'" *Devon Energy*, 450 S.W.3d at 210 (quoting *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex.1993)). A declaratory judgment is appropriate only if a justiciable controversy exists as to the rights and status of the parties and the declaration will resolve the controversy. *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995). "[I]f a declaratory judgment

24

will terminate the uncertainty or controversy giving rise to the lawsuit, the trial court is duty-bound to declare the rights of the parties as to those matters upon which the parties join issue." *Univ. of Tex. v. Nat'l Collegiate Athletic Ass'n*, 685 S.W.2d 409, 410 (Tex. App.—Austin 1985, writ ref'd n.r.e.) (first citing *Calvert v. Emps. Ret. Sys. of Tex.*, 648 S.W.2d 418, 419 (Tex. App.—Austin 1983, writ ref'd n.r.e.); and then citing Robert W. Calvert, *Declaratory Judgments in Texas—Mandatory or Discretionary?*, 14 ST. MARY'S L.J. 1 (1982)).

In its original petition, Element referred to the 1958 High Crest deed and alleged that Chandler and Childress conveyed to High Crest an "[e]xcess [r]oyalty," which was "over and above" the 1/32 royalty that they reserved in the deed. Element also referenced the "excess royalty" in the declaratory judgment it sought in its original petition, and addressed the "excess royalty" in its motion for partial summary judgment. Element's next pleading was its first amended petition wherein it asserted that its lessors are entitled to the excess royalty emanating from the 1958 High Crest deed.

Element's live pleading at the time of the summary judgment hearing was its second amended petition. Near the beginning of the petition, Element pleaded that it was seeking declaratory relief, including a claim that its lessors were "entitled to a proportionate share of any royalty payable under the Leases they execute over and above 1/8." This allegation is similar to its other pleadings that referenced the "excess royalty." In another portion of Element's second amended petition, it alleged: "High Crest also became entitled to any royalty over and above the 'usual'1/8 payable under any oil and gas lease that High Crest, its successors or assigns, might thereafter execute covering the grantors' retained 1/4 non-executive mineral interest." Element accompanied this allegation with a chart showing that Chandler and Childress conveyed the "excess royalty" to High Crest, and that the royalty reserved by Chandler and Childress was "limited to 1/4 of 1/8."

25

In its initial motion for joinder, PetroLegacy referenced Element's pleadings concerning the excess royalty, which Element alleged arose from the 1958 High Crest mineral deed. Element added Jase as a party to this proceeding based upon PetroLegacy's initial joinder request by virtue of Jase's status as a party affected by the 1958 High Crest deed.[14] In this regard, Jase had no claims with respect to the 1962 mineral deeds.

In response to Jase's motion for summary judgment, PetroLegacy filed a subsequent motion to abate to compel the joinder of additional parties wherein PetroLegacy asserted, "PetroLegacy maintains that the relief sought by Element necessarily requires a construction of the High Crest Deed." And then in its amended motion to abate, PetroLegacy asserted, "PetroLegacy and [Jase] maintain that the relief sought by Element necessarily requires a construction of the High Crest Deed." PetroLegacy filed both motions after Element filed its second amended petition.

Additionally, in PetroLegacy's motion for summary judgment, it asserted that Element was incorrect in its assertion with respect to the excess royalty arising from the 1958 High Crest deed.[15] PetroLegacy supported this contention with a citation to Element's second amended petition. In the hearing that addressed PetroLegacy's motion for summary judgment, it presented an argument regarding its position as to what the 1958 High Crest mineral deed conveyed. PetroLegacy offered this argument in support of its claim that, if the grantors to the 1962 deeds retained the disputed 1/8 leasehold interest, it was an impermissible naked executive interest. As noted previously, Appellants make the same contention on appeal.

---

[14]Element's operative pleading that added Jase and the other Rule 39 defendants began as follows: "Below is a list of all additional Rule 39 Defendants, each being an interest owner in the Minerals and an additional required party under Rule 39 of the Texas Rules of Civil Procedure."

[15]XTO made a similar contention in its motion for summary judgment.

26

The trial court considered Jase's motion for partial summary judgment at the same hearing wherein it considered PetroLegacy's and XTO's motions for summary judgment. In addressing PetroLegacy's contention that Jase had not pleaded a claim for affirmative relief, Jase's attorney argued that Element had pleaded that the grantors conveyed the "excess royalty" in the 1958 High Crest deed and had sought a declaration to the effect. He further asserted that Element had pleaded for a declaratory judgment that included the "excess royalty" claim and that Element joined Jase based upon PetroLegacy's motion for joinder. Jase's attorney also cited to our decision in *CareFlite v. Rural Health Emergency Med. Servs., Inc.* for the proposition that a counterclaim cannot be filed to a declaratory judgment action unless the party seeks greater relief than originally sought by the plaintiff. 418 S.W.3d 132, 142–43 (Tex. App.—Eastland 2012, no pet.). Jase asserted that it sought no greater relief than that sought by Element with respect to the 1958 High Crest deed.

We disagree with PetroLegacy's contention that no party pleaded an affirmative claim for declaratory relief for the construction of the 1958 High Crest deed. As noted above, Element pleaded for a construction of the 1958 High Crest deed with its contention that the grantors under the deed conveyed the "excess royalty" to High Crest. Because of Element's pleadings about the "excess royalty" being conveyed in the 1958 High Crest deed, PetroLegacy filed multiple motions seeking joinder of any party claiming under that deed. Thus, the remaining question to resolve is whether the pleadings of the other parties were a sufficient basis for Jase's motion for partial summary judgment.

We initially address Jase's contention that our holding in *CareFlite* precluded Jase from asserting a claim for the same declaratory relief that Element had requested. We do not read *CareFlite* in this manner. We held in *CareFlite* that "when a declaratory judgment counterclaim has greater ramifications than the

27

original suit, the court may allow the counterclaim." 418 S.W.3d at 143 (quoting *BHP Petroleum Co. v. Millard*, 800 S.W.2d 838, 842 (Tex. 1990)). This holding was based on the premise that "[t]he Declaratory Judgments Act is 'not available to settle disputes already pending before a court.'" *BHP Petroleum*, 800 S.W.2d at 841 (first quoting *Heritage Life v. Heritage Grp. Holding*, 751 S.W.2d 229, 235 (Tex. App.—Dallas 1988, writ denied); and then citing *John Chezik Buick v. Friendly Chevrolet*, 749 S.W.2d 591, 594 (Tex. App.—Dallas 1988, writ denied)); *see CareFlight*, 418 S.W.3d at 142. Our holding in *CareFlite* addressed a defendant's attempt to transform the plaintiff's lawsuit into an action for declaratory judgment by simply denying the plaintiff's allegations. Here, a claim for declaratory judgment was already before the trial court by virtue of Element's pleadings. We do not agree that a party is prohibited from pleading the same declaratory relief as another similarly aligned party, either expressly or by adoption of another party's pleading.

Irrespective of our disagreement with Jase's reading of *CareFlite*, we conclude that the trial court did not err by granting declaratory relief that had the effect of construing the 1958 High Crest deed even though Jase did not affirmatively plead for it. We have already concluded that the other parties sought a construction of the 1958 High Crest deed. In addition to being determinative of the property interests of those claiming under the 1958 High Crest deed, a construction of the 1958 deed was also relevant to nature of the interests possessed as a result of the 1962 mineral deeds. Thus, a declaration of the property rights emanating from the 1958 High Crest deed was a question upon which Jase obviously "join[ed] issue" with the other parties. *Cf. Univ. of Tex.*, 685 S.W.2d at 410; *Calvert*, 648 S.W.2d at 419. Further, PetroLegacy and XTO asserted the converse in their pleadings and motions for summary judgment—that the grantors to the 1958 High Crest deed retained the "excess royalty." Under the rules that apply to competing summary

28

judgment motions, the trial court was required to consider the summary judgment evidence presented by both sides and determine all questions presented. *See Emmett*, 459 S.W.3d at 583. Accordingly, the trial court did not err by construing the 1958 High Crest deed.

*The Nature of the Royalty Interest Reserved in the 1958 High Crest Deed*

Finally, Appellants assert that the trial court erred by concluding that the grantors in the 1958 deed reserved a fixed 1/32 royalty. Appellants contend that the grantors reserved a floating 1/4 royalty interest and as such, there was no "excess royalty" conveyed to High Crest in the 1958 deed.

The Texas Supreme Court has explained the distinction between a fixed royalty interest and a floating royalty interest in the following manner:

> A royalty interest "is a nonpossessory interest in minerals that may be separately alienated." It may be conveyed or reserved in two ways: "'as a fixed fraction of total production' (fractional royalty interest) or 'as a fraction of the total royalty interest' (fraction of royalty interest)." A fractional royalty interest is referred to as a fixed royalty because it "remains constant" and is untethered to the royalty amount in a particular oil and gas lease. A fraction of royalty interest is referred to as a floating royalty because it varies depending on the royalty in the oil and gas lease in effect and is calculated by multiplying the fraction in the royalty reservation by the royalty in the lease. The language used in the conveyance instrument determines whether the interest is fixed or floating.

*U.S. Shale Energy II, LLC v. Laborde Properties, L.P.*, 551 S.W.3d 148, 152 (Tex. 2018) (internal citations omitted); *see Hysaw v. Dawkins*, 483 S.W.3d 1, 9 (Tex. 2016). Thus, a fixed royalty is a fraction of gross production while a floating royalty is a fraction of the royalty reserved in an oil and gas lease. *See* Patrick LeMasters and Paul P. Santoyo, *Fixed vs. Floating*, State Bar of Tex., TXCLE Oil, Gas and Min. Title Examination Course 10-III (2022). As noted by a legal commentator, of the five "sticks" in "the bundle" of mineral interests, "[r]oyalty is likely the most litigated stick within the bundle." Christopher Kulander, "'Fixed vs. Floating'

29

Mineral and Royalty Questions in Texas: Is the End Any Nearer?," *Law of Permian Basin Oil & Gas Development and Operations* 6B-1, 6B-1 (Found. for Nat. Resources & Energy L. 2023).

In the 1958 conveyance, Chandler and Childress deeded to High Crest "an undivided one-fourth (1/4th) interest in and to all of the oil, gas and other minerals in and under and that may be produced" from the described tracts. In this regard, the 1958 deed provided that "[i]t is the intent of this mineral deed to convey to [High Crest] one-half (1/2) of all the oil, gas and other minerals and all mineral rights, royalties and other titles to oil, gas and other minerals conveyed to [Chandler and Childress]" by prior conveyance. The 1958 deed also contained a provision conveying the executive right to High Crest to lease Chandler's and Childress's retained mineral interests. After these provisions, the 1958 mineral deed contained the following provision:

> PROVIDED, HOWEVER, Grantors shall be entitled to receive one-fourth (1/4th) of the cash bonus for any such lease, one-fourth (1/4th) of the delay rentals, and *one-fourth (1/4th) of the usual one-eighth (1/8th) royalty (and Grantors shall be entitled to 1/4th of the 1/8th royalty irrespective of the amount of royalty actually provided for in any lease executed by Grantee, its successors or assigns)*, one fourth (1/4th) of any shut-in gas royalty or penalty royalty, or other payment paid in lieu of actual production and marketing, and such cash bonus, delay rentals, royalties, and other payments to which Grantors, their heirs and assigns, may be entitled.

(Emphasis added.)

The effect of the "PROVIDED, HOWEVER" provision is disputed on multiple fronts. As an initial matter, the parties dispute whether the provision constitutes a reservation. Appellees assert that the clause constitutes a reservation of a fixed 1/32 royalty. Conversely, Appellants contend that the "PROVIDED, HOWEVER" provision is not a "reservation at all," but rather it is a clause reinforcing that the grantors had not parted with the rights to receive bonus, delay

30

rentals, and royalty payments incident to their retained 1/4 mineral interest. Further, Appellants assert that if the "PROVIDED, HOWEVER" provision is a reservation, it is a reservation of a floating royalty interest. Under this alternative view of the provision, Appellants contend that the italicized portion of the clause merely establishes a floor of a 1/8 royalty for future leases that the grantee might execute.

Similar to the 1962 mineral deeds, the grantors in the 1958 High Crest deed only granted a portion of the interest they possessed. *See Piranha Partners*, 596 S.W.3d at 748. By doing so, they withheld a portion of their estate from the conveyance. *See id.* But the 1958 deed also contained the "PROVIDED, HOWEVER" provision that addressed the nature of the interest withheld by the grantors. "[A] reservation is made in favor of the grantor, wherein he reserves unto himself royalty interest, mineral rights and other rights." *Patrick v. Barrett*, 734 S.W.2d 646, 647 (Tex. 1987) (citing *Benge v. Scharbauer*, 259 S.W.2d 166, 167–68 (Tex. 1953)); *see Bright v. Johnson*, 302 S.W.3d 483, 488 (Tex. App.—Eastland 2009, no pet.). Irrespective of whether the "PROVIDED, HOWEVER" provision is technically a reservation that inures to the benefit of the grantors, it is a part of the written conveyance that must be construed to ascertain the nature of the interest withheld by the grantors. *See Wenske*, 521 S.W.3d at 792 ("We determine [the parties'] intent by conducting a careful and detailed examination of a deed in its entirety.").

In the "PROVIDED, HOWEVER" provision, the parties used a "double fraction" to describe the reserved interest. As noted by the Texas Supreme Court in *Van Dyke v. Navigator Grp.*, 668 S.W.3d 353, 357, 362 (Tex. 2023) (*Van Dyke*),[16] the use of a double fraction to describe a mineral interest creates a

---

[16]The 1924 deed at issue in *Van Dyke* contained a reservation of "one-half of one-eighth" of the "minerals and mineral rights." *Van Dyke*, 668 S.W.3d at 357. Prior to the submission of the instant appeal, our court had issued its opinion in *Van Dyke v. Navigator Grp.*, 647 S.W.3d 901, 908 (Tex. App.—Eastland

dilemma—did the parties use the double fraction with the intent that the two fractions be treated as purely an arithmetic expression of a single number by simply multiplying the two fractions, or did the parties mean something different? *See Van Dyke III*, 731 S.W.3d at 764–65. The dilemma is particularly heightened when parties used the term "1/8" in an oil and gas conveyance. *Van Dyke*, 668 S.W.3d at 359. The court in *Van Dyke* held that "[a]ntiquated instruments that use 1/8 within a double fraction raise a presumption that 1/8 was used as a term of art to refer to the "mineral estate." *Id*.

With respect to the concept of "[a]ntiquated" deeds, the court began its analysis in *Van Dyke* by noting the well-established premise that courts should adopt the ordinary meaning of a word "[u]nless otherwise defined in the text." *Id.* at 359. More specifically, courts should adhere to the "meaning at the time of drafting." *Id.* at 359–60. Thus, "[t]he test is what the text reasonably meant to an ordinary speaker of the language who would have understood the original text in its context." [17] *Id.* at 360; *see Van Dyke III*, 731 S.W.3d at 764.

The supreme court based the presumption it recognized in *Van Dyke* on its earlier opinion in *Hysaw*, 483 S.W.3d at 4, a will-construction dispute involving a 1947 will that bequeathed to each child a "one-third of one-eighth royalty." *Van Dyke*, 668 S.W.3d at 362 (quoting *Hysaw*, 483 S.W.3d at 4). In *Hysaw*, "[t]he Court identified two related circumstances that explain why 1/8 in such instruments did

---

2020), *rev'd*, 668 S.W.3d 353 (Tex. 2023) (*Van Dyke I*), wherein we concluded that the grantors reservedone-sixteenth of the minerals. In *Van Dyke*, the Texas Supreme Court reversed our holding in *Van Dyke I* by determining that the grantors reserved 1/2 of the mineral estate. *Van Dyke*, 668 S.W.3d at 368. *Van Dyke III* is our opinion after the remand of *Van Dyke*. *Navigator Grp. v. Van Dyke*, 731 S.W.3d 759, 762 (Tex. App.—Eastland 2026, no pet. h.) (*Van Dyke III*).

[17]We are unaware of any authority that delineates what constitutes an "antiquated" deed under *Van Dyke* with respect to the application of its presumption. However, we note that the Fourth Court of Appeals has recently opined that the *Van Dyke* presumption is not limited to archaic instruments. *Hoffman v. Thomson*, No. 04-19-00771-CV, 2026 WL 758737, at *5 (Tex. App.—San Antonio Mar. 18, 2026, no pet.).

not typically bear its arithmetical meaning: the historical use of 1/8 as the standard royalty and the estate-misconception theory." *Id.* (citing *Hysaw*, 483 S.W.3d at 8).

> As we noted in *Van Dyke III*:

> The [Texas Supreme Court in *Van Dyke*] found that, in the context of antiquated deeds, there were "two widespread and related faulty conceptual culprits . . . that worked in tandem to lead parties to use the term '1/8' to describe something other than a literal eighth." Those concepts are the estate misconception theory and the historical standardization of the term "1/8" (also sometimes described as "the legacy of the 1/8 royalty").

731 S.W.3d at 765 (internal citations omitted) (quoting *Van Dyke*, 668 S.W.3d at 363). "The estate-misconception theory reflects the prevalent (but, as it turns out, mistaken) belief that, in entering into an oil-and-gas lease, a lessor retained only a 1/8 interest in the minerals rather than the entire mineral estate in fee simple determinable with the possibility of reverter of the entire estate." *Van Dyke*, 668 S.W.3d at 363 (citing *Hysaw*, 483 S.W.3d at 10). Thus, grantors often mistakenly used the term "1/8" to refer to the entirety of their mineral interest. *Id.* In a similar manner, the Texas Supreme Court found that the term "1/8" had acquired a special meaning as a standard royalty, since the use of a 1/8 royalty was "near ubiquitous" at the time. *Id.* (quoting *Hysaw*, 483 S.W.3d at 9–10). Thus, "parties would use the term 1/8 as a placeholder for future royalties *generally*—without anyone understanding that reference to set an arithmetic value." *Id.*

The supreme court in *Van Dyke* summarized its holding with respect to deed construction as follows:

> Specifically, when courts confront a double fraction involving 1/8 in an instrument, the logic of our analysis in *Hysaw* requires that we *begin* with a presumption that the mere use of such a double fraction was purposeful and that 1/8 reflects the *entire* mineral estate, not just 1/8 of it.

*Id.* at 364. The court further noted that this presumption is "readily and genuinely rebuttable. . . . [T]he entire instrument should be examined to determine whether its text rebuts the presumption." *Id.* (citing *Hysaw* 483 S.W.3d at 14).

The court in *Van Dyke* also addressed the presumed-grant doctrine as another basis for confirming its holding.[18] *Id.* at 366. "The presumed-grant doctrine, 'also referred to as title by circumstantial evidence, has been described as a common law form of adverse possession.'" *Id.* (quoting *Fair v. Arp Club Lake, Inc.*, 437 S.W.3d 619, 626 (Tex. App.—Tyler 2014, no pet.)). In this regard, the court noted in *Van Dyke* that "*both* parties acted in accordance with *each* side owning a 1/2 interest." *Id.*

The Texas Supreme Court recently revisited its holding in *Van Dyke* in *Clifton v. Johnson*, 733 S.W.3d 16 (Tex. 2026). *Clifton* involved a 1951 royalty deed with a future lease clause that used the following language to describe the interest conveyed to the grantees: "1/128 (1/16 of the usual 1/8 royalty) part of all of the oil, gas and other minerals taken and saved under such lease or leases." *Id.* at 20. The court addressed whether this language referenced a fixed 1/128 interest, or a floating 1/16 interest with respect to future leases. *Id.* at 19–20. The court reaffirmed in *Clifton* that *Van Dyke* recognized that "[w]hen '1/8' is part of a double fraction in an antiquated mineral conveyance, courts presume that it refers to the entire interest," but this "presumption is readily and genuinely rebuttable." *Id.* (quoting *Van Dyke*, 668 S.W.3d at 364). The court concluded that the plain language of the deed in *Clifton* rebutted the presumption that the parties used 1/8 as a term of art to refer to the entire mineral estate. *Id.* at 20.

---

[18]We note that to date, none of the parties have asserted a claim pursuant to the presumed grant doctrine. Irrespective of this omission, the doctrine merits reference because of its likely significance in future cases.

*Clifton* arose from the Eighth Court of Appeals. *Johnson v. Clifton*, 719 S.W.3d 270 (Tex. App.—El Paso 2023), *rev'd*, 733 S.W.3d 16 (Tex. 2026). In reliance on *Van Dyke*, the court of appeals applied the presumption that the parties' use of 1/8 in the future lease clause was a reference to the entire mineral estate and that the clause conveyed a floating 1/16 royalty interest in future leases. *Id.* at 285–87. The Texas Supreme Court stated that the court of appeals correctly began its analysis with the presumption outlined in *Van Dyke*. *Clifton*, 733 S.W.3d at 21–22. However, the court concluded that the court of appeals erred by failing to determine that the text of the deed rebutted the presumption. *Id.* As noted by the supreme court:

> If textual "provisions—whether express or structural—illustrat[e] that a double fraction was in fact used as nothing more than a double fraction, the presumption will be rebutted." Thus, if a deed contains "express language, distinct provisions that could not be harmonized if 1/8 is given the term-of-art usage . . . , or even the repeated use of fractions *other* than 1/8 in ways that reflect that an arithmetical expression should be given to all fractions within the instrument," then courts should treat 1/8 as a fraction bearing its ordinary numerical value and then multiply the fractions to ascertain the conveyed interest.

*Id.* at 22 (internal citations omitted) (quoting *Van Dyke*, 668 S.W.3d at 359, 364–65).

The deed in *Clifton* conveyed "an undivided one-one hundred and twenty-eighth (1/128) interest in and to all of the oil, gas and other minerals in and under" specified tracts of land. *Id.* at 20. The supreme court concluded that the deed's express use of the product of the two fractions, (1/128), in the future lease clause indicated that the use of "1/16 of the usual 1/8 royalty" clause was simply an "explanatory parenthetical" of how the parties calculated the 1/128 future royalty figure. *Id.* at 22–23.

Additionally, the court addressed the presumed-grant doctrine in *Clifton*. *Id.* at 24–25. "[T]he presumed-grant doctrine helps ensure accuracy in double-fraction

35

cases. Both prongs, albeit in entirely distinct ways, ask the same question: *who owns this property today?*" *Id.* at 24. If the strict requirements of the presumed-grant doctrine are clearly met, "'a court could dispense with the deed-construction analysis' altogether." *Id.* at 25 (quoting *Van Dyke*, 668 S.W.3d at 368 n.11).

In light of the legal framework established by *Van Dyke* and *Clifton*, we address the parties' contentions. As we previously noted, Appellants contend that the grantors reserved a floating 1/4 royalty interest subject to a floor of a minimum lease royalty of 1/8. At the time that this case was originally briefed and submitted, *Van Dyke* had not been issued by the Texas Supreme Court. Appellants originally asserted that, under *Hysaw*, we should not apply "rote multiplication" of the 1958 mineral deed's double fraction ("one-fourth (1/4th) of the usual one one-eighth (1/8th) royalty") to compute a 1/32 fixed royalty. 483 S.W.3d at 4–5. They also cited *Butler v. Horton*, a case wherein we determined that a reservation of "one-half of the usual 1/8th royalty" was a reservation of a floating royalty. 447 S.W.3d 514, 519 (Tex. App.—Eastland 2014, no pet.).

Appellants also asserted that a holistic reading of the 1958 mineral deed supports a conclusion that the grantors reserved a 1/4 floating royalty interest because they also reserved 1/4 floating interests in bonus, delay rentals, and "penalty" royalties. They cited our holding in *Butler* in support of their argument that all of the reservations should be harmonized to conclude that a 1/4 floating royalty interest was reserved. *Butler*, 447 S.W.3d at 519. Finally, Appellants contended that the use of the word "irrespective" in the 1958 deed was an indication that the grantors reserved a floating royalty interest because it was "tied to the percentage of royalty under future leases and was not fixed." In this regard, Appellants contended that the use of the word "irrespective" is the mechanism in

the 1958 deed that creates the "floor" of a future lease providing for at least a 1/8 royal interest that would result in a minimum 1/32 reserved royalty interest.[19]

Prior to the issuance of the supreme court's opinion in *Van Dyke*, Jase asserted that the royalty reserved by the grantors in the 1958 High Crest deed was fixed because the quantum of royalty reserved was "irrespective of the amount of royalty actually provided for in any lease." Jase contended that the reserved royalty is fixed because it does not increase or decrease based on the royalty provided for in a future lease. In response to Appellants' argument that the reservation merely set a floor of a 1/8 royalty in future leases, Jase asserted that the language "establishe[d] both a floor and a ceiling by definition because it is fixed."

Jase also asserted that the legacy of the standard 1/8 royalty had no application to the 1958 deed because the parties expressly acknowledged that future leases may provide for a different royalty. Further, Jase attached as summary judgment evidence copies of other mineral leases in the area from the same time frame that provided for greater than a 1/8 royalty.

After the issuance of the opinion in *Van Dyke*, Jase asserted that Van Dyke's double-fraction presumption was rebutted by the "irrespective" clause in the 1958 mineral deed. It supported this contention with our statement in *Butler* that "[a] 'fractional royalty' interest, on the other hand, remains fixed regardless of the amount of the royalty provided for in a future lease." 447 S.W.3d at 517–18.

After the Texas Supreme Court issued its opinion in *Clifton*, Jase advised the court that the opinion supports its reading of the 1958 mineral deed. Jase contends

[19]Appellants asserted as follows:

The term "irrespective" reveals the grantors understood that the retained royalty was otherwise tied to the percentage of royalty under future leases and was not fixed. By including the "irrespective" language, the grantors created a floor that acts as a constraint on the grantee's exercise of the executive right covering the grantors' retained 1/4 mineral interest.

that the phrase "irrespective of the amount of royalty actually provided for in any lease executed by Grantee" confirms that the lease royalty is not relevant in determining the Grantor's retained royalty.

In response to Jase's subsequent briefing after *Clifton*, Appellants contend that Jase misconstrues *Van Dyke* and *Clifton* by failing to properly apply the cases to the 1958 deed. Appellants contend that we must begin with the *Van Dyke* presumption that the use of the double fraction that included 1/8 indicates that a floating royalty was intended. They assert that had the parties intended to describe a 1/32 fixed royalty interest, they would have simply used that exact fraction. Appellants point to the fact that the deed in *Clifton* used "1/128" to describe the interest at issue. But here, the 1958 mineral deed never uses the fraction "1/32."

Finally, Element's successor, High Noon Resources, asserted after *Clifton's* issuance that the "irrespective" clause establishes the parties' recognition that a royalty interest could be different than 1/8. Further, it asserts that the words "irrespective of the amount of royalty actually provided for" would be written out of the 1958 deed if the *Van Dyke* presumption is applied.

With the parties post-*Van Dyke* and *Clifton* arguments in mind, we address the effect of these opinions to our analysis. Because the "HOWEVER, PROVIDED" provision employs a double fraction using 1/8, *Van Dyke* requires that we begin with the presumption that the parties' use of 1/8 was a reference to the entire mineral estate. 668 S.W.3d at 359. Thus, if one *only* applies the *Van Dyke* presumption, the grantors reserved a 1/4 floating royalty interest. *See id.* This conclusion would be consistent with our holding in *Butler* that a reservation of "one-half of the usual 1/8th royalty" was a reservation of a floating royalty. 447 S.W.3d at 519. In this regard, the "HOWEVER, PROVIDED" provision used the descriptive qualifier "usual" immediately prior to the term "one-eighth" the first

time it stated the double fraction.[20] *See id.* Further, a 1/4 floating interest would be in harmony with the reserved 1/4 floating interest in bonus, delay rentals, and shut-in royalties as well as the fact that the grantors withheld a 1/4 interest in the mineral estate from the conveyance.

However, the more difficult question to resolve in this case is whether the *Van Dyke* presumption was rebutted by the text of the 1958 deed. Here, the "HOWEVER, PROVIDED" provision did not end with the words "one-fourth (1/4th) of the usual one-eighth (1/8th) royalty"; it continued with the parenthetical phrase "(and Grantors shall be entitled to 1/4th of the 1/8th royalty *irrespective of* the amount of royalty actually provided for in any lease executed by Grantee, its successors or assigns)." (emphasis added). "We examine the entire [instrument] and seek to harmonize and give effect to all provisions so that none will be meaningless." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). Because the parenthetical phrase is a part of the 1958 deed, we must include it in our construction of the grantors' withheld royalty interest. *See id.*

The above parenthetical phrase is significant in at least two respects. First, it is an express acknowledgement that the parties to the 1958 deed were not laboring under the belief of a 1/8 standard royalty; they expressly acknowledged that a future lease may provide for a royalty other than 1/8. Thus, the parenthetical phrase negates one of the foundational bases for the *Van Dyke* presumption—the concept of a "standard and customary" 1/8 royalty in all future leases. *See Hysaw*, 483 S.W.3d at 9. And as noted in *Hysaw*, the belief in a 1/8 standard royalty is a "related

---

[20]As discussed below, we note that the 1958 deed actually stated the double fraction twice in reference to the grantors' withheld royalty interest: "one-fourth (1/4th) of the usual one-eighth (1/8th) royalty (and Grantors shall be entitled to 1/4th of the 1/8th royalty irrespective of the amount of royalty actually provided for in any lease executed by Grantee, its successors or assigns)."

issue" to the theory of estate misconception, the other foundational element of the *Van Dyke* presumption. *Id.* at 10.

The other significant aspect of the parenthetical phrase is that it untethers the royalty interest withheld by the grantors from the royalty amount in a future oil and gas lease by its use of the words "irrespective of." *See U.S. Shale*, 551 S.W.3d at 152. "Irrespective of" is simply defined as "regardless of." *Irrespective of*, MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003). Applying this definition to the parenthetical phrase, the 1958 deed provided that the royalty interest withheld by the grantors for future leases was "regardless of" "the amount of royalty actually provided for in any lease executed by Grantee." Thus, the parenthetical phrase indicates that the parties intended for the reserved royalty interest to be a fixed fraction of total production, i.e. a fixed royalty interest, because it was not tied to the royalty interest provided for in future leases. *See Hysaw*, 483 S.W.3d at 9 ("A fractional royalty interest conveys a fixed share of production and 'remains constant regardless of the amount of royalty contained in a subsequently negotiated oil and gas lease.'" (quoting *Coghill v. Griffith*, 358 S.W.3d 834, 838 (Tex. App.—Tyler 2012, pet. denied))); *Medina Interests, Ltd. v. Trial*, 469 S.W.3d 619, 623 (Tex. App.—San Antonio 2015, pet. denied) ("A conveyance of a fractional royalty transfers a fixed fraction of production of the minerals produced from the land irrespective of the percentage royalty in any subsequently negotiated oil and gas lease."). Thus, we conclude that the parties intended to create a fixed royalty in the 1958 deed in favor of the grantors by their use of the parenthetical phrase.

We must still determine the quantum of the royalty interest withheld by the grantors in the 1958 deed. Unlike the deed in *Clifton*, the 1958 deed did not use the numerical product of the double fraction—1/32—in its text to rebut that 1/8 was used as a reference to the entire mineral estate. *See Clifton*, 733 S.W.3d at 19–20.

40

Instead, we have the double fraction—"one-fourth (1/4th) of the usual one-eighth (1/8th) royalty"—immediately followed by the restated double fraction—"and Grantors shall be entitled to 1/4th of the 1/8th royalty"—followed by the words "irrespective of the amount of royalty actually provided for in any lease executed by Grantee."[21]

If we apply the *Van Dyke* presumption to read that the parties referred to the entire mineral estate by using 1/8 in the double fraction and thereby agree with Appellants' interpretation by finding a 1/4 floating royalty interest, then we would ignore the fact that the parenthetical phrase indicates that the parties intended for the grantors to withhold a fixed royalty interest that was "irrespective" of the amount of royalty interest in a future lease. Further, the conclusion that the grantors withheld a 1/4 fixed royalty would lead to an unreasonable result given the fact that the grantors only owned a 1/4 interest in the mineral estate after the conveyance. *See Kourosh Hemyari v. Stephens*, 355 S.W.3d 623, 626–27 (Tex. 2011) (We avoid construing an instrument's language to lead to any absurd result.).

Despite the fact that the parties used a double fraction containing 1/8, we conclude that the text of the 1958 deed rebuts the *Van Dyke* presumption. The parenthetical phrase untethered the royalty interest withheld by the grantors from the amount of royalty in future leases, thereby indicating that the parties intended for the grantors to withhold a fixed royalty interest. Further, the parenthetical phrase expressly confirms that the parties were aware that a future lease might be in an amount other than a standard 1/8 royalty. Accordingly, we conclude that the parties intended for the double fraction to be multiplied ($1/4 \times 1/8 = 1/32$) by their use of the double fraction in the 1958 deed.

---

[21]As noted by the Texas Supreme Court in *Clifton*, "[t]he universe of double-fraction cases includes many variations, including cases far more complex than either *Van Dyke* or this case." *Clifton*, 733 S.W.3d at 23. In our opinion, this case falls in the category of "more complex" cases.

We overrule Appellants' third issue.

*This Court's Ruling*

For the reasons stated, we affirm the judgment of the trial court.

JOHN M. BAILEY
CHIEF JUSTICE

July 10, 2026

Panel consists of: Bailey, C.J.,
and Trotter, J.[22]

Williams, J., not participating.

---

[22]At the time of submission on oral argument, Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sat on the panel by assignment. Unfortunately, he passed away before the issuance of this opinion.